1

2

3

4

5

6

7

**FILED**

MAR - 7 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

8               UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10                      ----oo0oo----

11  REDDING ELEMENTARY SCHOOL
    DISTRICT,
12                                    NO. CIV. S-00-1174 WBS GGH
              Plaintiff,
13                                    **MEMORANDUM AND ORDER**

14      v.

15  AMANDA GOYNE, et al.,

16          Defendants.
                                  /
17  CONSOLIDATED WITH

18
    AMANDA GOYNE, et al.,
19
            Plaintiffs,
20
        v.
21
    REDDING ELEMENTARY SCHOOL
22  DISTRICT, et al.,

23          Defendants.
                                  /
24                      ----oo0oo----

25
            These suits involve the Redding Elementary School
26
    District's (the "District") obligation to pay for the cost of
27
    education of a private school student under the Individuals with
28

                              1

1  summary judgment pursuant to Federal Rule of Civil Procedure 56.

2  I.  Factual and Procedural Background

3          Defendant Amanda Goyne is a fourteen-year-old student
4  who has a severe to profound hearing loss.  Amanda has been
5  living within the Redding Elementary School District since she
6  became eligible for special education services on December 7,
7  1990.  According to her parents (the "Goynes"), Amanda began
8  attending the St. Joseph School as a pre-school student in 1990.
9  Since kindergarten in 1992, Amanda has been attending regular
10 education classes at the St. Joseph and St. Francis private
11 schools.[1]  The District provided special education services for
12 Amanda, including speech and language therapy, from 1992 through
13 1999.  Pursuant to her "individualized education program" ("IEP")
14 under the IDEA, the District also provided a one-on-one, full-
15 time sign language interpreter for Amanda during the school years
16 from 1996 through 1999.

17         In the Spring of 1999, the District informed the Goynes
18 that under the new regulations implementing amendments to the
19 IDEA, the District was no longer obligated to provide special
20 education services or an interpreter for Amanda if she remained
21 enrolled in private school.

22         During Amanda's annual IEP meeting on June 2, 1999, the
23 District offered a regular education classroom placement for
24 Amanda at her neighborhood public school, Turtle Bay.  The Goynes
25 rejected the District's offer because they did not believe it was

26

27         [1]   Amanda attended St. Joseph Elementary School through
   the fifth grade in 1998, and then transferred to St. Francis
28 Middle School.

1 an appropriate education program for Amanda.

2        On August 6, 1999, the Goynes filed a request for a due
3 process hearing with the California Special Education Hearing
4 Office pursuant to 20 U.S.C. § 1415(f) and California Education
5 Code sections 56501 and 56502.  The Hearing Officer found that
6 the District was not obligated to provide a "free appropriate
7 public education" for Amanda during the 1996-97, 1997-98, and
8 1998-99 school years.  With respect to the 1999-2000 school year,
9 however, the Hearing Officer concluded that the District's offer
10 dated June 2nd, 1999, was insufficient and did not provide a
11 "free appropriate public education" under the IDEA.  The Hearing
12 Officer accordingly ordered the District to reimburse the Goynes
13 for the cost of Amanda's tuition at St. Francis Middle School for
14 that year through March 13, 2000.[2]  The Hearing Officer also
15 determined that the District must reimburse the Goynes for the
16 cost of Amanda's full-time interpreter for the 1999-2000 school
17 year through March 13, 2000.  Finally, the Hearing Officer found
18 that the District did not conduct an appropriate assessment of
19 Amanda's "educational and social-emotional needs" and thus, must
20 reimburse the Goynes for the cost of an independent evaluation.

21        Both parties have appealed the Hearing Officer's
22 decision pursuant to 20 U.S.C. § 1415(i)(2).[3]

23 ///

24

25        [2]     The Hearing Officer determined that California
26 Education Code section 56506.2(a) barred his ability to award
   prospective relief beyond the date of the hearing, March 13,
27 2000.

28        [3]     This court consolidated the two separate actions in an
   order filed August 11, 2000.

1  II.   Applicable Law

2           The IDEA, originally enacted in 1975 as the "Education
3  for All Handicapped Children Act," provides federal assistance to
4  state and local agencies for the education of children with
5  disabilities.   To qualify for assistance under the Act, a State
6  must provide a "free appropriate public education" ("FAPE") for
7  disabled children that is tailored to the unique needs of the
8  disabled child through the development of an "individualized
9  educational program."   20 U.S.C. § 1412(a)(1)&(4).

10          A "free appropriate public education" means "special
11 education and related services" that:

12          (A) have been provided at public expense, under public
                supervision and direction, and without charge;
13          (B) meet the standards of the State educational agency;
                (C) include an appropriate preschool, elementary, or
14          secondary school education in the State involved; and
                (D) are provided in conformity with the individualized
15          education program required under [the Act].

16 20 U.S.C. § 1401(8). An "individualized education program" or
17 "IEP" is "a written statement for each child with a disability
18 that is developed, reviewed, and revised in accordance with
19 section 1414(d) of [the Act]."   20 U.S.C. § 1401(11).

20          Under section 1414(d), the local educational agency
21 "shall have in effect, for each child with a disability in its
22 jurisdiction, an individualized education program."   20 U.S.C. §
23 1414(d)(2).   The IEP is developed and reviewed each year by a
24 team comprised of the child's parents, teachers and other
25 specialists.   20 U.S.C. § 1414(d)(1)(B).   The IEP team must
26 review the IEP annually, and make appropriate revisions.

27          Section 1412, subdivision (a)(10) addresses the state's
28 obligations with respect to "children enrolled in private schools

4

1  by their parents," a circumstance which is commonly referred to
2  as "unilateral enrollment or placement."  20 U.S.C. §
3  1412(a)(10)(A)&(C).  The provision generally requires a state to
4  provide special education and related services for unilaterally
5  placed children.  However, a local education agency is not
6  required

7          to pay for the cost of education, including special
           education and related services, of a child with a disability
8          at a private school or facility if that agency made a free
           appropriate education available to the child and the parents
9          elected to place the child in such private school or
           facility.
10

11  20 U.S.C. § 1412(a)(10)(C)(i).

12          Before the 1997 amendments to the IDEA, regulations
13  under the Act only excused the payment of "the cost of
14  education," but not "special education and related services."
15  See 34 C.F.R. § 300.403 (1996-1998) ("If a child with a
16  disability has FAPE available and the parents choose to place the
17  child in a private school or facility, the public agency is not
18  required by this part to pay for the child's education at the
19  private school or facility.").

20          Current section 1412 further states:

21          If the parents of a child with a disability, who previously
           received special education and related services under the
22          authority of a public agency, enroll the child in a private
           elementary or secondary school without the consent of
23          referral by the public agency, a court or a hearing officer
           may require the agency to reimburse the parents for the cost
24          of that enrollment if the court or hearing officer finds
           that the agency had not made a free appropriate public
25          education available to the child in a timely manner prior to
           that enrollment.
26

27  20 U.S.C. § 1412(a)(10)(C)(ii).  This language codifies School
28  Comm. of the Town of Burlington v. Department of Educ.

1 ("Burlington"), 471 U.S. 359, 369 (1985), which held that a
2 parent has an equitable right to reimbursement for the cost of an
3 appropriate education in private school when the local
4 educational agency is unable to offer an appropriate placement in
5 public school.

6      The Act also requires participating states to establish
7 administrative procedures for the resolution of disputes
8 concerning a disabled child's IEP.  See 20 U.S.C. § 1415.  An
9 aggrieved party may appeal administrative findings and decisions
10 by filing a complaint in a district court of the United States.
11 III.  Discussion

12      The IDEA does not employ the usual deferential standard
13 of review for administrative decisions, but rather provides that
14 the court "(i) shall receive the records of the administrative
15 proceedings; (ii) shall hear additional evidence at the request
16 of a party; and (iii) basing its decision on the preponderance of
17 the evidence, shall grant such relief as the court determines is
18 appropriate."  20 U.S.C. §1415(2)(B).

19      Although the Ninth Circuit has characterized the
20 court's review under the IDEA as de novo, the requirement that
21 the district court receive the Hearing Officer's record "carries
22 with it the implied requirement that due weight shall be given to
23 the [administrative] proceedings."  Board of Educ. v. Rowley, 458
24 U.S. 176, 206 (1982); Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d
25 1493, 1499 (9th Cir. 1996).  The amount of deference given to the
26 administrative findings is within the court's discretion, and
27 increases when the findings are "thorough and careful."
28 Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891

1   (9th Cir. 1995).

2   The Ninth Circuit has also recognized that the
3   procedure under the IDEA is "not a true summary judgment
4   procedure," but is "essentially ... a bench trial based on a
5   stipulated record." Ojai Unified Sch. Dist. v. Jackson, 4 F.3d
6   1467, 1472 (9th Cir. 1993). "It is hard to see what else the
7   district court could do as a practical matter under the statute
8   except read the administrative record, consider the new evidence,
9   and make an independent judgment based on a preponderance of
10  evidence and giving due weight to the hearing officer's
11  determinations." Capistrano, 59 F.3d at 892. "Even though [this
12  method of review] does not fit well into any pigeonhole of the
13  Federal Rules of Civil Procedure," it is appropriate because it
14  "appears to be what Congress intended under the Act."
15  Capistrano, 59 F.3d at 892.

16  "A court's inquiry in suits brought under [the IDEA] is
17  twofold." Rowley, 458 U.S. at 206. "First, has the [District]
18  complied with the procedures set forth in the Act?" Id. "And
19  second, is the individualized educational program developed
20  through the Act's procedures reasonably calculated to enable the
21  child to receive educational benefits?" Id. at 207.

22  A.   The District's Compliance with Procedural Requirements
23       During the 1996-97, 1997-98, and 1998-99 School Years

24  The Goynes argue that the District committed procedural
25  violations during the 1996-97, 1997-98, and 1998-99 school years
26  which resulted in the denial of FAPE. Specifically, the Goynes
27  claim that "they never had a true opportunity to choose an
28  appropriate public placement for [Amanda]," because the District

7

1 did not make a formal written offer and recommendation for
2 placement of Amanda in public school.[4]  (Cross-Motion at 23).
3 According to the Goynes, they intended to enroll Amanda in public
4 school if the District had an appropriate program.

5       The Hearing Officer did not consider the District's
6 alleged failure to make a formal written offer of FAPE, but found
7 that the District was not obligated to provide FAPE for Amanda
8 during those years because "her parents chose to place her in a
9 private school setting."[5]  (Pl.'s Ex. 20 at 5-7).  The Hearing
10 Officer determined that the Goynes were not "dissatisfied with
11 the public school program," but rather, the Goynes "preferred"
12 the program and environment at the private schools.  (See Pl.'s
13 Ex. 20 at 5-6).  And the Hearing Officer concluded that the
14 District was "at most, obligated to provide Amanda with a genuine
15 opportunity for equitable participation in special education and
16 related services."  (Pl.'s Ex. 20 at 6)(quoting 34 C.F.R. §
17 76.651); 34 C.F.R. § 300.451 (the state educational agency shall
18 ensure that the requirements of 34 C.F.R. §§76.651-76.662 are
19 met).

20 ///

21

22 [4]      The Goynes also argue that the District failed to
adequately inform them of certain rights pursuant to 20 U.S.C. §
23 1415(d)(2) and California Education Code § 56301.  In support of
this argument, the Goynes' offered only one side of a two-sided
24 document titled "Notification of Parent-Child Rights."  (Def.'s
Ex. 2 at 24, 29, and 34).  In response, the District offered the
25 second side, which clearly discusses the alleged rights.  As a
result, this claim has no merit.

26 [5]      In his decision, the Hearing Officer seems to use the
terms "provide" and "offer" interchangeably when discussing the
27 District's obligation to pay for the cost of Amanda's education.

28

8

1       In 1996, regulations under the IDEA required that every
2  child with a disability have available a free appropriate public
3  education.  See 34 C.F.R. § 300.1 (stating a purpose "[t]o enure
4  that all children with disabilities have available to them a free
5  appropriate public education").  A school district was not
6  required to pay the cost of a child's education only if the
7  child's parents chose private school in lieu of an appropriate
8  public placement.  See 34 C.F.R. § 300.403 ("If a child with a
9  disability has FAPE available and the parents choose to place the
10 child in a private school ... the public agency is not required
11 ... to pay for the child's education at the private school.").
12 The question here is whether a school district must make a formal
13 written offer in order to satisfy its obligation to make FAPE
14 available under the IDEA.

15      In Union School Dist. v. Smith, 15 F.3d 1519 (9th Cir.
16 1994), the Ninth Circuit considered whether the school district
17 was required to make a formal written offer under the IDEA for a
18 particular placement to be considered in deciding whether the
19 school district offered FAPE.  The Ninth Circuit recognized that
20 "[t]he IDEA explicitly requires written prior notice to parents
21 when an educational agency proposes, or refuses, to initiate or
22 change the educational placement of a disabled child."  Smith, 15
23 F.3d at 1526; see 20 U.S.C. § 1415(b)(3) (current provision).
24 The court held that the requirement of a formal, written offer
25 "should be enforced rigorously" because it serves several
26 important purposes.  Smith, 15 F.3d at 1526.  A formal written
27 offer alerts the parents to serious consideration of the proposed
28 placement and provides them with an opportunity to accept or

1 reject the offer.  Id.  The court emphasized that parents must
2 have an opportunity to consider a school district's offer because
3 reimbursement for unilateral placement is only available if the
4 offer is inappropriate.  Id.

5       In Smith, the school district claimed that it did not
6 make a formal offer of placement at the other school because the
7 parents had expressed their unwillingness to consider such a
8 placement.  Id. at 1525.  The Ninth Circuit held that a school
9 district "cannot escape its obligation under the IDEA to offer
10 formally an appropriate educational placement" by arguing that
11 the parents were not willing to accept the placement.  Id. at
12 1526.

13       Other district courts in the Ninth Circuit have
14 followed the holding in Smith that the IDEA requires the district
15 to make a formal written offer.  See Glendale Unified School
16 District v. Almasi, 122 F. Supp. 2d 1093, 1107 (C.D. Cal. 2000)
17 ("The Court interprets Smith to require that the District
18 formally offer a single, specific program."); Bock v. Santa Cruz
19 City Schools, 1996 WL 539715 (N.D. Cal. 1996) ("A school district
20 must formally offer an appropriate educational placement.").

21       The undisputed facts here establish that the District
22 did not make a formal written offer of placement at a public
23 school.  Although the requirement may fairly be characterized as
24 hyper-technical, Smith mandates that a school district must make
25 such an offer for consideration by the parents.  The absence of
26 such an offer thus compels a finding that Amanda did not have
27 FAPE available under section 300.403 for the 1996-97, 1997-98,
28 and 1998-99 school years.

1    The court recognizes that procedural violations do not
2  necessarily result in a denial of FAPE under the IDEA unless the
3  violation results in the loss of an educational opportunity, or
4  seriously infringes upon the parents' opportunity to participate
5  in the IEP process.  See W.G. v. Bd. of Trustees, 960 F.2d 1479,
6  1484 (9ᵗʰ Cir. 1992).  The Goynes do not contend here that Amanda
7  was deprived of an "appropriate" education during the relevant
8  years, but rather, the District's failure to make a formal,
9  written offer of placement deprived Amanda of a "free" education.
10 The court concludes that for the purpose of determining a
11 parent's right to reimbursement for the unilateral placement of a
12 child in private school, a school district's failure to make a
13 formal offer of public placement constitutes a per se denial of
14 FAPE.

15    Before regulations implementing the 1997 amendments to
16 the IDEA became effective in 1999, a parent had "an equitable
17 right to reimbursement for the cost of providing an appropriate
18 private education" when a school district failed to make such
19 appropriate education available in public school.  Smith, 15 F.3d
20 at 1524 (quoting Burlington, 471 U.S. at 369).  In order to be
21 entitled to reimbursement, the parent's chosen placement must be
22 an "appropriate alternative."  Smith, 15 F.3d at 1526 (quoting
23 W.G. v. Board of Trustees, 960 F.2d 1479, 1484 (9th Cir. 1992));
24 see also Burlington, 471 U.S. at 369 (parents' placement must be
25 "proper under the Act").

26    The evidence here shows that the St. Joseph and St.
27 Francis schools provided an appropriate education for Amanda.
28 During the 1996-97, 1997-98 and 1998-99 school years, Amanda

11

1 performed exceptionally, earning high marks and exceeding
2 expectations in reading and language skills.  (See Pl.'s Ex. 6 at
3 86-89).  The Goynes are accordingly entitled to reimbursement for
4 the cost of Amanda's education during those years.

5       B.   Sufficiency of the District's 1999-2000 Offer

6            The Goynes rejected the District's offer to place
7 Amanda at the neighborhood school in Turtle Bay for the 1999-2000
8 school year, because they believed the offer did not provide an
9 appropriate education for Amanda.  As a result of the District's
10 alleged failure to meet the requirements of FAPE under the IDEA,
11 the Goynes argue that they are entitled to reimbursement.

12           In Rowley, the United States Supreme Court considered
13 the standard for providing a "free appropriate public education"
14 under the Act.  The Court emphasized that the Act does not
15 require a state to maximize the potential of each handicapped
16 child.  See Rowley, 458 U.S. at 199 ("[T]o require ... the
17 furnishing of every special service necessary to maximize each
18 handicapped child's potential is, we think, further than Congress
19 intended to go.").  The Court held that a state satisfies the
20 requirement of the IDEA by providing a "basic floor of
21 opportunity" consisting of "personalized instruction with
22 sufficient support services to permit the child to benefit
23 educationally from that instruction."  Id. at 201, 203.

24           The personalized instruction and services "must be
25 provided at public expense, must meet the State's educational
26 standards, must approximate the grade levels use in the State's
27 regular education, and must comport with the child's IEP."  Id.
28 at 203; see also 20 U.S.C. § 1401(8).  Further, the personalized

                                12

1 instruction "should be reasonably calculated to enable the child
2 to achieve passing marks and advance from grade to grade."  Id.
3 at 204; see also W.G., 960 F.2d at 1487 ("The substantive
4 standard [for FAPE] is simply 'some educational benefit.'").

5 　　　　The Hearing Officer's determination that the District's
6 offer did not provide FAPE for the 1999-2000 school year is
7 inconsistent with the above standards.  The Hearing Officer found
8 that "one of Amanda's most significant unique needs for the 1999-
9 2000 school year was to be in the presence of peers who would
10 assist her in the learning and socialization process through
11 informal communication."  (Pl.'s Ex. 20 at 11).  He concluded
12 that the District was not able to meet this unique need because
13 the evidence showed that at that time, Turtle Bay had only a
14 handful of children who could demonstrate rudimentary signing
15 skills.  (Pl.'s Ex. 20 at 12).  On the other hand, the Hearing
16 Officer emphasized that Amanda's classmates at St. Francis had
17 been with her for several years, and thus "had learned to
18 communicate comfortably with her."  Id. at 12.

19 　　　　The Hearing Officer's comparison mistakenly places an
20 impossible burden on the District to replicate Amanda's
21 environment at St. Francis, without the benefit of an opportunity
22 to establish a similar peer group at Turtle Bay.'  In making his
23 decision, the Hearing Officer cited California Education Code

24

25 　　　⁶　　According to Lori Goyne, Amanda's mother, she held
volunteer sign language sessions with Amanda's classmates during
26 the 1995-96 and 1996-97 school years.  Lori Goyne taught forty
one-hour sessions per year and the students were signing with
27 Amanda on a daily basis during the 1996-97 school year.  See
(Def.'s Ex. 9 at 61-63) (explaining that Amanda's teacher
28 cooperated by developing a point system to encourage students to
practice signing with Amanda).

13

1  section 56000.5, which states: "It is essential that hard-of-
2  hearing and deaf children, like all children, have an education
3  with a sufficient number of language mode peers with whom they
4  can communicate directly and who are of the same, or
5  approximately the same, age and ability level." Cal. Bus. &
6  Prof. Code § 56000.5(b)(4). The court finds no authority
7  suggesting that this provision places a higher burden on the
8  District than the requirements for FAPE under the IDEA.[7]

9        The District's offer satisfies the requirements of the
10 IDEA and the standard set for in Rowley. The District offered
11 regular classroom placement at Turtle Bay during the 1999-2000
12 school year with the same special education services that the
13 District provided in previous years, including speech and
14 language therapy. (See Pl.'s Ex. 31 at 6-7); (See Pl.'s Ex. 20
15 at 9)(finding that the District offered enhanced audio, speech
16 and language therapy, and the use of a sign language
17 interpreter). In addition, the District offered to install
18 sound field equipment in each of Amanda's classrooms, obtain a
19 TTY phone, use closed caption televisions, assign note-takers,
20 and provide on-going disability awareness for general education
21 students. (See id.). To assist with Amanda's transition from
22 St. Francis, the District further promised to assign peer
23 buddies, and provide weekly sessions with the school psychologist
24 and a deaf and hard-of-hearing counselor. (See id; Pl.'s Ex.
25 16).

26

27        [7]    State standards that impose a greater duty are
   enforceable under the IDEA if such standards are not inconsistent
28 with federal standards. See Smith, 15 F.3d at 1524.

14

1          Further, the District's offer addressed Amanda's need
2  for language mode peers "in a manner that would afford [her] an
3  opportunity to benefit educationally."  Capistrano, 59 F.3d at
4  884, 893.  As noted above, the District offered to assign peer
5  buddies who would assist Amanda with her transition to Turtle
6  Bay.  The District also promised to offer a sign language
7  elective for sixth, seventh, and eighth grade students at Turtle
8  Bay.  Christine Licker, who previously taught such an elective at
9  Turtle Bay, testified that as many as forty students could
10 finger-spell and demonstrate between twenty and fifty signs.
11 (See Pl.'s Ex. 32 at 138, 153).  Notably, Ms. Licker stated that
12 she used finger-spelling in her history class and that some
13 students used finger-spelling and signs to communicate with each
14 other.   (See id.).

15         Plaintiffs argue that the District should have offered
16 "regionalized programming," whereby all hearing-impaired students
17 in the school district would be educated at one school or "hub"
18 in order to assure that Amanda has a sufficient number of
19 language mode peers.  They point to such a program at the
20 Lakewood School in Stanislaus County as an example of what would
21 in their view be an "appropriate" program for Amanda.

22         At oral argument, the District argued that the
23 implementation of such a program would not be practical in Shasta
24 County, because it is more rural than Stanislaus County and does
25 not lend itself to the same kind of region-wide transportation of
26 hearing-impaired students to a single location.  The court has no
27 basis to find that the program employed in Stanislaus County
28 would be practical, or even possible, in Shasta County, or that

15

1  it would provide similar results in Shasta County.  Even if such
2  a program would be successful, the IDEA does not require the
3  District to maximize Amanda's learning potential.

4      "An 'appropriate' public education does not mean the
5  absolutely best or 'potential-maximizing' education for
6  [Amanda]."  Smith, 15 F.3d at 1524 (quoting Gregory K. v.
7  Longview School Dist., 811 F.2d 1307, 1310 (9th Cir. 1987).
8  The program outlined by the District is reasonably calculated to
9  enable Amanda to advance from grade to grade.  The only other
10 thing the District could do to satisfy the Goynes is to transfer
11 Amanda's peer group from St. Francis to Turtle Bay--what
12 obviously is impossible.

13     It is not surprising that over the seven years since
14 the Goynes placed Amanda in private school, she developed a
15 unique and comforting relationship with her peers at the St.
16 Joseph and St. Francis schools.  It does not follow, however,
17 that the District is required to duplicate that environment.  The
18 program offered by the District is personalized and provides the
19 same services that have enabled Amanda to excel in previous
20 years.  Because the District's offer provides, at a minimum, a
21 basic floor of opportunity for Amanda to achieve academic
22 success, the District has made FAPE available under the IDEA.

23     C.   The Cost of a Full-Time Sign Interpreter for 1999-2000

24     Under the current regulations, a school district is not
25 required to pay the cost of special education and related
26 services if the district made FAPE available and the parents
27
28

16

1 unilaterally placed the child in private school.[8]  See 34 C.F.R. §
2 300.403 (1999).  The amended language is different from prior
3 regulations, which excused a school district from payment of the
4 cost of a private school education, but required the district to
5 make special education and related services available to children
6 unilaterally placed in private school.  See 34 C.F.R. § 300.403
7 (1996).

8        Prior to 1999, the Goynes were entirely satisfied with
9 Amanda's individualized program and the District's provision of
10 special services, including a full-time, one-on-one sign language
11 interpreter.  In fact, the Goynes referred to their relationship
12 with the District during this period as a "partnership."  (See
13 Pl.'s Ex. 31 at 10).  The change in the regulations, not any
14 conduct on the part of the District, is responsible for the
15 Goynes current dissatisfaction.

16        Because the court has concluded above that the District
17 made FAPE available for the 1999-2000 school year, the District
18 is not required to supplement Amanda's private school education
19 with the special service of a full-time, one-on-one sign language
20 interpreter.

21        D.   The Cost of an Independent Psychological Assessment

22        The IDEA requires evaluation of a child with a
23 disability for the purpose of determining necessary special
24 education and related services at least once every three years,

25

26        [8]     The current regulations further provide that "[n]o
   private school child with a disability has an individual right to
27 receive some or all of the special education and related services
   that the child would have received if enrolled in a public
28 school."   34 C.F.R. § 300.454 (1999).

1   and any time "conditions warrant" such an evaluation.  20 C.F.R.
2   § 14114(a)(2).

3       The parties appear to dispute the date of Amanda's last
4   assessment.  According to the Hearing Officer, Amanda's last
5   assessment was December 15, 1997, which would have placed her
6   next triennial assessment on December 15, 2000.  However, the
7   Goynes argue that Amanda's last assessment was in September of
8   1995.  After the IEP meeting on June 2, 1999, the Goynes retained
9   Dr. Victoria Pickering to conduct an independent evaluation of
10  Amanda before the due process hearing in August.

11      Regardless of the due date of her triennial assessment,
12  the Hearing Officer determined that the District's proposed
13  change in placement from private school to Turtle Bay warranted
14  evaluation of Amanda's social and emotional status.  See Cal.
15  Educ. Code § 56320 (assessments must consider "all areas related
16  to the suspected disability including, where appropriate, ...
17  social and emotional status").  The Hearing Officer found that
18  "the District had an obligation to assess Amanda's social and
19  psychological needs before convening an IEP meeting to propose
20  such a drastic change in placement."  (Pl.'s Ex. 20 at 16).

21      The District argues that its offer did not propose a
22  change in placement because the District did not place Amanda in
23  private school in the first place.  Further, the District argues
24  that the Goynes are not entitled to reimbursement for the cost of
25  an independent evaluation unless they obtained the evaluation
26  because they disagreed with the District's own assessment.  See
27  Cal. Educ. Code § 56329 ("A parent has the right to obtain, at
28  public expense, an independent educational assessment of the

18

1 pupil from qualified specialists, .... if the parent disagrees
2 with an assessment obtained by the public education agency.").

3          The Hearing Officer's decision with respect to the
4 District's obligation is supported by the record.  The placement
5 of Amanda in public school after she attended private school for
6 seven years could potentially impact her psychological well-
7 being, and thus affect the special education services required to
8 to provide her with a basic floor of opportunity for academic
9 progress.  As the Hearing Officer found, evaluation was warranted
10 in this circumstance.

11          IT IS THEREFORE ORDERED that Amanda Goyne's motion for
12 summary judgment with respect to the District's obligation to pay
13 for the cost of her private school education during the 1996-97,
14 1997-98, and 1998-99 school years be, and the same hereby is,
15 GRANTED.  The District is hereby ordered to reimburse the Goynes
16 in the amount of $9,725.00, which represents the total cost of
17 Amanda's private school tuition during the 1996-97, 1997-98, and
18 1998-99 school years.

19          IT IS FURTHER ORDERED that the District's motion for
20 summary judgment with respect to the District's obligation to
21 provide special education and related services during the 1999-
22 2000 school year be, and the same hereby is, GRANTED; and the
23 District's motion with respect to the cost of the independent
24 ///
25 ///
26 ///
27 ///
28 ///

19

1 | psychological assessment performed by Dr. Pickering be, and the
2 | same hereby is, DENIED.  The District is hereby ordered to
3 | reimburse the Goynes in the amount of $2,520.00, which represents
4 | the total cost of the independent assessment.
5 |          IT IS SO ORDERED.
6 | DATED: March 6, 2001
7 |
8 |                         _____
9 |                         WILLIAM B. SHUBB
                            UNITED STATES DISTRICT JUDGE

20

United States District Court
for the
Eastern District of California
March 7, 2001


* * CERTIFICATE OF SERVICE * *


2:00-cv-01174


Redding Elementary

    v.

Goyne

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  March 7, 2001, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Susan Elizabeth Slager                    SH/WBS
Johnson Schachter and Collins
California Plaza
2180 Harvard Street
Suite 560
Sacramento, CA  95815-3317

Frank Richard Ruderman
Ruderman and Roth
2277 Fair Oaks Boulevard
Suite 220
Sacramento, CA  95825


Jack L. Wagner, Clerk

BY: _____
    Deputy Clerk